**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **SMARTPHONE** | § | |
| **TECHNOLOGIES LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **Civil Action No. 6:10-CV-74-** |
| | § | **LED-JDL** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **RESEARCH IN MOTION CORP., et al.,** | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

This claim construction opinion construes the disputed claim terms in U.S. Patent No. 6,505,215 (the "215 Patent"), entitled "Method & Apparatus for Synchronization of Two Computer Systems Supporting Multiple Synchronization Techniques by Using Synchronization Transport Modules," and U.S. Patent No. 6,711,609 (the "609 Patent"), entitled "Method and Apparatus for Synchronization an Email Client on a Portable Computer System With an Email Client on a Desktop Computer" that are unique to this action. Those disputed terms also found in the claims at issue in *Smartphone Technologies LLC v. HTC Corporation*, No. 6:10-cv-580, will be construed subsequent to a *Markman* Hearing scheduled for March 6, 2012. On December 15, 2011, the Court held a claim construction hearing to construe the disputed terms unique to this action. For the reasons stated herein, the Court adopts the constructions set forth below.

**OVERVIEW OF THE PATENTS**

The patents in suit are directed towards methods and apparatuses for synchronizing a portable computer with a desktop or personal computer. *See* the '215 Patent at Abstract; the '609

1

Patent at Abstract. The '215 Patent describes a portable computer device that synchronizes records

with a desktop or personal computer. Claim 17, the sole asserted claim of the '215 Patent, recites:

> 17. A portable computer comprising:
> a first application executable on the portable computer;
> a plurality of transport modules, including a first wireless transport module
> and a first direct connection transport module;
> a first set of records for use with the first application, the first set of records
> being accessible to the transport modules in the plurality of transport modules;
> a synchronization application executable on the portable computer to identify
> at least a portion of the first set of records, to identify a selected a transport module
> from the plurality of transport modules, and to send the portion of the first set of
> records over a medium of the selected transport module in order to synchronize the
> first set of records with a corresponding set of records of a first computer system.

'215 Patent at 10:40-55. The '609 patent describes a method for synchronizing email on a portable

computer with a desktop computer. Claim 6 is representative of the asserted claims:

> 6. A method for exchanging data between a portable computer and a second
> computer, the method comprising:
> receiving, on the second computer, a first signal from the portable computer
> to exchange data with the portable computer;
> in response to the first signal, synchronizing a first set of messages on the
> portable computer with a second set of messages on the second computer;
> receiving, on the second computer, a second signal from the portable
> computer through the second computer to an intended recipient;
> in response to the second signal, receiving the data from the portable
> computer, and
> sending the data to the intended recipient; and
> wherein the step of receiving the data from the portable computer is
> performed concurrently with the step of synchronizing a first set of messages on the
> portable computer with a second set of message on the second computer.

'609 Patent at 7:6-25.

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d

1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive."  *Id.*  Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent."  *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance.  *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope.  *Phillips*, 415 F.3d at 1316.  Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).  This

presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent"). The well established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l*

*v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted).  "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted).  Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318.  Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.*  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## DISCUSSION

The disputed terms and their corresponding constructions are set forth below.

## I.     The '215 Patent

### a.  "synchronize"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.<br><br>If construed, "ensuring that the email state on a portable computer matches the email state on another computer" | "comparing two sets of messages and reconciling the differences" |

Plaintiff argues that the term "synchronize" is readily understandable to a lay juror and therefore no construction is necessary. *See* PLAINTIFF'S CLAIM CONSTRUCTION BRIEF (DOC. NO. 294) ("PLTFF'S BRIEF") at 13. Plaintiff argues that the term "synchronizing" and its variants are broader than "reconciliation" and the patentee recognized this in the specification but deliberately chose the term "synchronizing" in the claims rather than "reconciling" or a variant thereof. *See* PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF (Doc. No. 324)("REPLY") at 6.

Defendants argue that synchronization should be construed as "comparing two sets of messages and reconciling the difference" because the '215 patent incorporates by reference U.S. Patent No. 5,727,202 ("the '202 patent") which describes a synchronization process where two sets of records are compared "to determine new, updated, or deleted records." '202 Patent at 3:41-45; DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF (DOC. NO. 315) ("RESPONSE") at 14 (citing '215 Patent at 2:45-55).

Although a lay jury may understand the modern computer-related concept of "synchronize," the Court is tasked with determining "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *See Phillips,* 415 F.3d at 1313. Moreover, a "fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document." *Merk & Co. v. Teva Pharms. USA, Inc.,* 347 F.3d 1367, 1371 (Fed. Cir. 2003); *Phillips*, 415 F.3d at 1316 (accord). Thus, where the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise posses[,] . . . the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Although an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision." *In re*

*Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In this case, the patentee clearly defined synchronization: "The synchronization setting is the default method of operation wherein the corresponding databases on both the desktop and portable are reconciled." '215 Patent at 5:44-46; *see also id.* at 2:38-41 ("the synchronization process combines the data from the modified personal computer calendar **155** and the data from the modified hand held calendar **115** into a single reconciled calendar"). Thus, the Court construes "synchronize" to mean "to reconcile the differences between."

The Court declines to include a comparing step as proposed by Defendants because "synchronization" as defined by the patentee in the '215 specification, does not require a comparison step. Although the incorporated '202 patent describes a synchronization method that includes a comparison step, the patentee chose to use a broader definition in the '212 patent disclosure. *See* '215 Patent at 5:44-46. Defendants' attempt to read an embodiment from an incorporated reference into the claims is contradicted by the patentee's unambiguous definition of "synchronization" in the native '215 specification. *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n,* 75 F.3d 1545, 1553 (Fed. Cir. 1996) ("incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent"), *overruled on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 234 F.3d 556 (Fed. Cir. 2000); *Fifth Generation Comp. Corp. v. Int'l Bus. Machine Corp*, 416 Fed. Appx. 74, 80 (Fed. Cir. 2011) (accord). Moreover, Defendants provide no argument why one embodiment of a patent incorporated by reference should override the patentee's express definition in the '215 patent. Given the clear definition of synchronize in the specification, a person having ordinary skill in the art would understand "synchronize" to mean "to reconcile" despite the incorporated patents which disclose embodiments that include a comparing

step.

Plaintiff's arguments that "to reconcile" is not synonymous with "synchronizing" are unavailing. First, Plaintiff argues that the '215 patent does not use the word "reconcile" in its description of the preferred embodiment, the "Synchronization Transport Adaptation Layer." REPLY at 6. However, the specification clearly defines synchronization as a form of reconciling differences and that definition is never modified or distinguished in the remainder of the specification.[1] Second, Plaintiff cites to a Wikipedia definition of "synchronize" dated November 28, 2011 which, according to Plaintiff, distinguishes between reconciliation and synchronization.[2] *See id.* (citing EX. G TO REPLY). As explained above, the Court is tasked with determining what "synchronize" means to a person having ordinary skill in the art at the time of the invention, i.e. at the time of the priority date of the application. *See Phillips*, 415 F.3d at 1313. Thus, the Court gives this little weight. *See id.* at 415 F.3d at 1317 (explaining that extrinsic evidence such as dictionary definitions is "less significant than the intrinsic record in determining the legally operative meaning of claim

---

[1]The Court notes that Plaintiff originally proposed that "synchronization application" be construed as "software that reconciles data between applications on two or more computer systems" which supports the Court's construction of "synchronize" as "to reconcile." *See* PLTFF'S BRIEF at 14. This proposed construction was, however, withdrawn at the *Markman* hearing." *See* TRANSCRIPT OF *MARKMAN* HEARING (Doc. No. 347)("MARKMAN TRANSCRIPT") at 67:25-58:6, 69:17-7:22.

[2] Plaintiff's citation of a Wikipedia entry not only suffers from the deficiencies discussed above, but other more fundamental problems. As this Court explained in *Performance Pricing v. Google:*

>The content on this website is provided by volunteers from around the world—anyone with internet access can provide or modify content. *See Iovate Health Sciences, Inc. v. Bio–Engineered Supplements & Nutrition, Inc.*, No. 9:07-cv-46, 2008 WL 859162, *8 n. 4 (E.D.Tex. Mar.28, 2008) (Clark, J.). Thus, not only is the information unreliable, *Techradium, Inc. v. Blackboard Connect Inc.*, No. 2:08-cv-214 (Ward, J.), 2009 WL 1152985, *4 n. 5 (E.D.Tex. April 29, 2009), but it can potentially change on a day-to-day basis.

*Performance Pricing, Inc. v. Google, Inc.*, No. 2:07-cv-432, 2009 WL 2497102, at *12 n. 15 (E.D. Tex. Aug., 13, 2009).

language")(internal quotations omitted).

Because the patentee acted as his own lexicographer to define "synchronizing" as the "method of operation wherein the corresponding databases on both the desktop and the portable computer are reconciled," the Court construes "synchronize" as "to reconcile the differences between."

### b. "application"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary.<br><br>If construed, "a computer program." | "A software program used for a particular function, excluding system control software and support processes." |

At the outset, Defendants agree that there is no substantive difference between "a computer program" and "a software program." RESPONSE at 5 n.4. Thus, the essential dispute between the parties is (1) whether to exclude "system control software and support processes" from the definition of "application" and (2) whether to include a "used for a particular function" limitation. As will be explained in more detail below, the Court construes "application" as "a computer program."

Plaintiff argues that no construction is necessary because it is "readily apparent that this term simply means an application that runs on a computer." *See* PLTFF'S BRIEF at 9. Plaintiff further argues that the specification does not limit application to computer programs with which a user directly interacts. REPLY at 2. As an example, plaintiff cites to the abstract, which states that "'the selection [of a transport module] *could be* from a user.'" *Id.* at 2 (quoting '215 Patent at Abstract)(alterations in original). For Plaintiff, "[t]his is consistent with the description of the preferred embodiment, in which the synchronization program services *applications*, not *users*." *Id.* (citing '215 Patent at 7:23-37)("The synchronization program then queries each synchronization

transport adaptation layer module to determine which applications can create 'services' for that particular synchronization transport adaptation layer module (service creators))."

Defendants argue that the plain and ordinary meaning of "application" excludes system software. In other words, "[a]pplications are software programs with which users interact." RESPONSE at 5. Defendants argue that Figure 10 of the '215 Patent and its accompanying description in the specification "distinguishes the high-level applications from [] lower level system software" such as the DL server, synchronization transport adaptation layer, TCP/IP and PP stack, and the serial link driver. *Id.* at 7. Moreover, at the *Markman* hearing Defendants pointed to embodiments found in the '202 patent and other patents incorporated by reference that show an application performing tasks for a user. *See* the '215 patent at 4:61-67 ("the system administrator . . . requests a synchronization"); *id.* at 5:14-18 ("When a user that receives the preconfigured portable computer system first synchronizes the portable computer system . . ."); *id.* at 7:55-60 ( " . . . The user can then select which synchronization transport adaption layer module and service to use when a synchronization is to be performed"). Defendants also rely heavily on several dictionary definitions and textbook descriptions that contrast "application program" with system software or operating systems. *See id.* at 5-6.

First, the Court declines to include the phrase "used for a particular function" in its construction of application because the phrase is required by neither the specification nor the extrinsic evidence provided by the parties. Defendants argue that because "Plaintiff did not dispute Defendants' requirement that the program be 'used for a particular function" and they "cannot conceive of any reasonable objection given that all programs perform functions." RESPONSE at 5 n. 5. However, it is self evident from the claim language that the "application" performs functions.

*See, e.g.,* '215 Patent at 10:48-55 (Claim 17)("a synchronization application . . . to identify at least a portion of the first set of records, to identify a selected transport module . . . and to send the portion of the first set of records . . ."). Plaintiff's objection appears, however, to be that Defendants' proposal limits the application's functions to those performed *for a user* at the exclusion of functions performed at the system level.

The Court declines to adopt the remainder of Defendants' construction for several reasons. First, neither the specification nor the claims require a construction that excludes system control software or support processes. While the specification discusses "applications" that interact with a user, it does not do so at the exclusion of those that do not. For example, Claim 17 requires a synchronization application to "send a portion of the first set of records over a medium of the selected transport module." *See* '215 Patent at 10:48-55 (Claim 17). This appears to allow for some back-end functionality where the application is not interacting directly with the user. Similarly, the specification discloses applications that are capable of providing back-end processes such as "creating services" for system components and using the transport modules for particular functions. *See* '215 Patent at 7:16-33;[3] *id.* at 7:34-38 ("The synchronization program then queries each synchronization transport adaptation layer module to determine which applications can create 'services' for that particular synchronization transport adaptation layer module (service creators)"); *id.* at 7:49-51 ("After learning which applications may create services for each synchronization

---

[3] "Referring to FIG. 10, the synchronization application communicates with a DL server (Desktop link server) that acts as a single unified communication interface for the synchronization application. … when the synchronization application is executed, the synchronization layer examines the creator ID and type of each application installed on the portable computer system to determine if the application is a synchronization transport adaptation layer module. Thus, the synchronization program generates a list of all the synchronization transport adaptation layer modules."

transport adaptation layer module (the service creators), the synchronization program queries all the service creators to obtain a list of the available services"); *id.* at 8:17-19 ("If an infrared device is coupled to the serial port of the portable computer system then the synchronization application can use the infrared synchronization transport module.)"

Defendants' proposal requires the exclusion of "system control software" and "support processes," terms that are not found in the specification and would require further construction. It is not readily apparent from the claims or the specification what "system control software" or "support processes" is referring to. This creates a significant risk of confusion particularly where Defendants' proposal attempts to define "application" by what it excludes.

As stated above, the parties' dispute centers on whether to construe "application" as expressly excluding system control software and support processes. Finding that neither the claims nor the specification requires a such a construction, the Court declines to construe "application" beyond "a computer program." *See 02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

c. **"synchronization application"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>but if construed, "Software that reconciles data between applications on two or more computer systems" | To be construed in the context of the constructions for "application" and "synchronize."<br><br>If the Court desires a separate construction, then: "an application that compares two sets of records used by two other applications and reconciles the differences." |

The Court construes "synchronization application" in the context of the constructions of

"application" and "synchronize." Thus, for the reasons discussed above, the Court construes "synchronization application" as "a computer program that reconciles differences."

### d. "transport module"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.<br><br>If construed, "a single interface that handles communications over communications means between a portable computer and another computer system" | a single interface for the synchronization application that handles synchronization for a specific communication medium |

There are two main disputes over the proper construction of "transport module": (1) whether "transport module" is specifically tied to synchronization or is a generic communication interface and (2) whether the transport modules are specific to a particular communication medium. As will be explained in more detail below, the Court construes "transport module" as "a single interface that handles synchronization for a specific medium."

### i. *"transport modules" are specifically tied to synchronization*

Plaintiff argues that the specification generally teaches that "the transport modules handle synchronization between two computer systems over a respective interface connection." PLTFF'S BRIEF at 10 (citing '215 Patent at 7:61 - 8:22). Plaintiffs argue that Claim 17's recitation of "a plurality of transport modules, including a first wireless transport module and a first direct connection module" leaves open the possibility of other types of transport modules unrelated to synchronization. *See Id.* at 10 (citing '215 Patent at 10:43-45 (Claim 17)). Moreover, Plaintiff argues that the specification disclosed a "single consistent interface" that is capable of synchronizing but may have other uses. REPLY at 2-3.

Defendants argue that "transport module" should tied to synchronization because "the patent

identifies the transport modules of the synchronization transport adaptation lawyer as the 'present invention' and thus distinguishes the transport modules from the prior art generic communication interfaces." RESPONSE at 8. As result, Defendants argue that "transport module" is a "coined term with a particular meaning that distinguishes it from the generic interfaces known in the prior art." *Id.*

The Federal Circuit has repeatedly recognized that there is a "fine line between reading a claim in light of the specification and importing a limitation from the specification into the claim." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1255 (Fed. Cir. 2011)(citations omitted); *Phillips*, 415 F.3d at 1323-24. A claim term can be limited by the specification when the specification includes manifest words of exclusion or, in certain situations where "the specification manifests a clear intent to limit the term by using it in a manner consistent with only a single meaning." *Alrington Indus.,* 632 F.3d at 1254. A claim term may be limited if the patentee uses the phrase "the present invention" or "this invention" to describe a particular feature. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011)(collecting cases). These phrases may not be limiting where references to "the invention" are not uniform or "where other portions of the intrinsic record do not support applying the limitation to the entire patent." *Id.*

The Court construes "transport module" as "a single interface that handles synchronization for a specific medium" because the specification uniformly discusses transport modules in the context of "synchronization transport modules." *See, e.g.,* '215 Patent at Abstract ("a portable computer system is loaded with synchronization transport modules"); *id.* at 7:43-45 ("For example, a service for a network synchronization transport module would include the hostname and IP address of the desktop personal computer to synchronize with"); *id.* at 8:17-19 ("If an infrared device is

coupled to the serial port of the portable computer system then the synchronization application can use the infrared synchronization transport module. The infrared synchronization transport module implements the necessary IrDA standards needed to communicate with a personal computer having an IrDA compliant infrared port"). At no point in the specification does the patentee refer to the transport modules as anything but "synchronization transport modules."

Moreover, the specification distinguishes "transport modules" from generic communication interfaces. Figure 10 of the '215 patent shows the synchronization transport adaptation layer consisting of the cradle transport layer 1041, the network sync transport 1043, modem sync transport 1043, and infrared sync transport 1047, as separate from generic communication interfaces such as the serial link driver 1060 and the serial port 1070. *See* '215 Patent Fig. 10. The specification further states that the transport modules "handle[] synchronization." For example:

> Referring to FIG. 10, a first synchronization transport adaptation layer module is a cradle transport. The cradle transport ***handles synchronization*** directly between a serial port on the portable computer system and a serial port on the desktop computer system.

> The second synchronization transport is a network synchronization transport. The network synchronization transport ***handles synchronization*** directly between the portable computer system and a desktop computer system using TCP/IP networking.

'215 Patent at 7:61-8:3 (emphasis added). Thus, a transport module handles synchronization for a particular communication medium, e.g. serial port connection or network connection.

Lastly, the specification states "[t]o accommodate all these different synchronization methods, the present invention introduces a synchronization transport adaptation layer."[4] While not individually dispositive, the patentee's identification of the "synchronization transport adaptation

---

[4] During the *Markman* hearing, Plaintiff conceded that the "transport adaptation layer" is synonymous with "transport modules." *See* MARKMAN TRANSCRIPT at 38:10-12 ("the present invention introduces a synchronization transport adaptation layer, which is the transportation modules").

layer" as the invention combined with the specification's uniform use of "synchronization transport module" lends considerable support to a finding that "transport modules" are specifically tied to synchronization. Thus, the Court finds that the patentee limited the term "transport module" to synchronization.

### ii. A "transport module" is tied to a particular communication medium

First, the phrase "communication medium" is supported by the claim language. For example, Claim 17 requires that the synchronization application "identify a selected transport module from the plurality of transport modules" and send records "over a medium of the selected transport module." *See* '215 Patent at 10:48-54 (Claim 17). Moreover, the term medium is consistently used across the claims. *See, e.g., id.* at 9:1-2 (Claim 1) (". . . sending over a medium corresponding to the identified transport module . . ."); *id.* at 9:12-13 (Claim 2)(same); *id.* at 10:5-6 (Claim 10)(same); *id.* at 10:14 (Claim 11) ( . . . in response to sending over the medium . . ."); *id.* at 10:57-60 (Claim 18) ("The portable computer of claim 17, wherein the synchronization application is executable to receive a second set of records from the computer system over the medium of the selected transport module . . ."). While the phrase "communication means" is found in the specification, reading it into the claims would produce unnecessary confusion particularly where "communication medium" is consistently found within the claims. This is particularly true where Plaintiff provides no independent justification for including it in the construction of "transport module."

Second, the specification clearly indicates that each transport module "handles communication for a specific type of communication means." *id.* at 7:22-24; *see also id.* at Fig. 10 (depicting four individual transport modules serving separate communication paths: cradle, network, modem, and infrared). Moreover, the specification only describes individual transport modules as

being associated with a single communication medium. *See, e.g.,* '215 Patent at 7:60-64 (cradle module); *id.* at 7:65-8:3 (network module); *id.* at 6:16-21 (infrared module). As Defendants point out, this does not preclude the possibility of having a portable computer with a plurality of transport modules from a variety of communication media. *See* RESPONSE at 10.

In sum, the Court finds that the transport modules are specifically tied to synchronization because the inventor described "the present invention" as a "synchronization adaptation layer," which the parties agree is referring to the transport modules; the specification uniformly describes the transport modules in the context of "synchronization transport modules;" and the specification distinguishes between the synchronization transport modules and generic interfaces. Thus, the Court construes "transport module" as "a single interface that handles synchronization for a specific medium."

### e. "direct connection"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.<br><br>If construed, "non-wireless connection" | wired connection |

Plaintiff argues that "direct connection" has a plain and ordinary meaning readily understood by a lay jury and therefore no construction is necessary. PLTFF'S BRIEF at 11. Claim 17 recites "a plurality of transport modules, including a first ***wireless*** transport module, and a first ***direct connection*** transport module." '215 Patent 10:42-44 (Claim 17) (emphasis added). Thus, "direct connection" must be something other than a "wireless connection." Plaintiff does not disagree that a "direct connection" is distinct from a "wireless connection" but argues that construing "direct connection" as "wired connection" unduly limits the scope of the claim. REPLY at 4. While "non-

17

wireless" may be broader than "wired" in the abstract sense of the terms, practically speaking, the

terms are equally limiting. This is highlighted by Plaintiff's inability to identify a hypothetical

connection that is "non-wireless" but not wired. The addition of non-wireless into the claim risks

the possibility of confusion the jury with no added benefit. Although mindful of the dangers of

importing limitations into the claims, the Court nevertheless construes "direct connection" as "wired

connection" to prevent the possibility of juror confusion.

### f. "the first set of records being accessible to the transport modules in the plurality of transport modules"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary.<br><br>If construed, "the transport modules are able to access the first set of records" | "the first set of records can be synchronized with a corresponding set of records using each of the at least one wireless transport module and at least one direct connection transport module" |

Defendants argue that "accessible" must be construed to include an explanation that the

transport modules referenced in the claim term must also include "at least one wireless transport

module and at least one direct connection transport module" as dictated by the remaining elements

of Claim 17. RESPONSE at 11-12. Defendants argue that the "only description in the patent that can

possibly correspond to the disputed claim limitation is the discussion of whether an application can

connect to a transport module . . . ." *Id.* at 12. Thus, for Defendants, "accessible" in the context of

the disputed claim term must mean that "the first set of records can be synchronized with a

corresponding set of records." *See id.* Plaintiff counters that defining "being accessible" this way

is "nonsensical and contrary to the ordinary meaning of the word 'accessible.'" REPLY at 4-5.

Plaintiff asserts that while the specification does not use the term "accessible" in relation to transport

modules, the specification uses the word in its "ordinary sense" in other places. *Id.* at 5 (citing the

'215 Patent at 6:13-18) ("To minimize the synchronization time, the present invention also provides a method of altering the synchronization behavior when the synchronization is being performed across a modem link. This feature is configured on the portable computer system since the remote desktop personal computer is not ***accessible.***")(emphasis added).

The Court construes "the first set of records being accessible to the transport modules in the plurality of transport modules" as "the transport modules are able to access the first set of records." As noted above, "being accessible" is not explicitly defined in the specification; however, the specification generally describes the phrase as:

> After learning which applications may create services for each synchronization transport adaptation layer module (the service creators), the synchronization program queries all the service creators to obtain a list of the available services. After obtaining a list of all the available services for all of the available synchronization transport adaptation layer modules, the synchronization program displays a list of the available synchronization transport adaptation layer modules and their respective services. The user can then select which synchronization transport adaptation layer module and service to use when a synchronization is to be performed.

'215 Patent at 7:49-60.  While Defendants are correct that this generally describes the acessibilty feature in terms of the synchronization process, it does not follow that such language should be inserted into the term's construction.  Having construed "transport module" above as "a single interface that handles synchronization for a specific medium," the Court finds no further need to insert "synchronize" or its other variants into this claim element.  The above paragraph suggests that "being accessible" in the context of Claim 17 simply means that the transport modules have the ability to access the first set of records.  In other words, a single interface that handles synchronization for a specific medium has the ability to access the first of records.

Furthermore, Defendants are correct that Claim 17 requires that "the transport modules of the plurality of transport modules" must include "at least one wireless transport module and at least

one direct connection transport module." *See* RESPONSE at 12 (citing '215 Patent Claim 17). However, the claim language speaks for itself. The Court declines to insert redundant claim language when a juror could readily determine that the transport modules referred to in this element are the same as those referred to in the first claim element.

### g. "to identify at least a portion of the first set of records"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | "To determine which of the first set of records are to be communicated to another computer system to synchronize the first set of records." |

Defendants argue that construction of "to identify at least a portion of the first set of records" is "necessary to clarify the claimed identification of records is not divorced from the synchronization process." RESPONSE at 13. The Court, however, declines to read "synchronization" into this term. The surrounding claim language establishes that the identification is part of a larger synchronization process. Indeed, the claim element in question recites: "a synchronization application executable on the portable computer to identify at least a portion of the first set of records . . . ." '215 Patent 10:48-50 (Claim 17). Thus, it is readily apparent from the claim language itself that the identification is tied to the synchronization process and the Court finds no construction is necessary.

### h. "computer system"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | "a personal computer" |

Defendants argue that "computer system" should be limited to "a personal computer" because several patents incorporated by reference refer to "the present invention" as methods and

apparatuses for synchronizing a portable computer system with a personal computer.  *See* RESPONSE at 15-17.  Specifically with regards to the native '215 specification, Defendants argue that the specification identifies the present invention as a "synchronization transport layer" to accommodate synchronization methods between a portable computer and a desktop personal computer.  *See id.* at 16-7 (citing '215 Patent at 6:62-7:10).

As explained above, the Federal Circuit has recognized that in certain situations, referencing a feature of an invention as "the present invention" can justify importing a limitation into the claims.  *See Absolute Software, Inc.*, 659 F.3d at 1136.  However, the identification of "the present invention" must be used uniformly across the disclosure.  For example, in *Absolute Software*, the court declined to import a limitation into the claim where a portion of specification identified the purported limitation as one of "two optional features of the 'present invention'"despite earlier references in the specification requiring the "present invention" to include both features.  *Id.* at 1137.  In this case, the '215 patent's identification of the "present invention" as a "synchronization transport adaptation layer" does not unambiguously limit "computer system" to a "personal computer."  Even if Defendants are correct that this language identifies a feature of the "present invention" as requiring a personal computer,[5] the specification makes clear that a "personal computer" is merely an optional variant computer system: "the present invention has been described with reference to synchronization between a portable computer systems and a desktop personal computer system.  However, the same techniques can easily be applied to other types of computer

---

[5]The Court notes that the specification passage cited by Defendants does not unambiguously identify the present invention as relating to a "personal computer."  As best, the specification identifies the "present invention" as a "synchronization transport adaptation layer," but this does not limit the disclosure to personal computers.  *Cf. Honeywell Int'l, Inv. v. Honeywell Intellectual Properties, Inc.,* 452 F.3d 1312, 1318-19 (Fed. Cir. 2006) (limiting the term "fuel injection system component" to "fuel filter" because the written description specifically referred to "fuel filter" as the  "this invention" or "the present invention")

devices." '215 Patent at 2:15-19; *Absolute Software, Inc.,* 659 F.3d at 1137; *See also Praxair, Inc. v. ATMI, Inc.,* 543 F.3d 1306, 1326 (Fed. Cir. 2008) (references to a specific embodiment as "the apparatus of this invention" in the specification "are contradicted by express statements in the specification clearly indicating that [the feature at issue] is a feature only of certain embodiments"). Thus, neither the native language in the '215 specification, nor the patents incorporated by reference require the term "computer system" to be construed as "personal computer."

Having concluded that "computer system" is not limited to "personal computer," the Court finds that the claim language speaks for itself and therefore finds no construction necessary. *See 02 Micro Int'l Ltd.,* 521 F.3d at 1361.

## II. The '609 Patent

### a. "second computer"[6]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary. | "a personal computer" |

Defendants argue that "second computer" should be construed as a "personal computer" because (1) the specification consistently describes synchronization between a portable computer and a desktop personal computer; (2) in a parent application, the applicant distinguished prior art by indicating that the "second computer" is a "personal computer;" and (3) "second computer" is used throughout the claims of the '609 patent to refer to a personal computer. *See* Response at 23-25. For the reasons set forth below, the Court adopts Defendants' proposal and construes "second computer" as "personal computer."

The '609 specification consistently and uniformly describes the synchronization process as

---

[6] The term "second computer" is found in claims 6,7, and 11-13 of the '609 Patent.

occurring between a portable computer and a desktop personal computer. *See, e.g.,* '609 Patent at

Title ("Method and Apparatus for Synchronizing an Email Client on a Portable Computer System

with an Email Client on a ***Desktop Computer***")(emphasis added); *id.* at Abstract ("a fully integrated

email system for a ***desktop computer*** with an associated palmtop computer is disclosed")(emphasis

added); *id.* at 1:16-20 ("the present invention discloses a system[] for synchronizing an email client

on a portable computer system with an email client on a ***desktop computer system***")(emphasis

added); *id.* at 1:55-61 ("the present invention introduces an email client for the portable computer

system and an email synchronization conduit for a ***desktop personal computer*** system")(emphasis

added); *id.* at 2:20-43 (describing each Figure as illustrating synchronization between a portable

computer and a "***personal computer system***")(emphasis added).

Furthermore, construing "second computer" as a "personal computer" is supported by the

prosecution history. The '609 patent is a continuation of application No. 08/790,622, issued as U.S.

Patent No. 6,401,112 ("the '112 Patent"). In responding to an examiner rejection, the patentee of

the '112 Patent explained:

> The present invention comprises an email synchronization system for a portable
> computer system. The main portion of the email synchronization system is an email
> synchronization conduit that resides on the ***desktop personal computer***. The email
> synchronization conduit on the ***desktop personal computer system*** is responsible for
> synchronizing the state of the portable computer client with an email client on a
> personal computer.

Ex. I to Response, Selected '112 Prosecution History (Doc. No. 315-10) ("'112 History"),

at 23 (emphasis added). The applicants further argued that the claims of the '112 patent should be

allowed over the asserted prior art references that described synchronization systems because neither

reference "discloses or teaches toward a synchronization system that uses portable computer system,

the personal computer system, and an email server . . .[which] uses a personal computer as the

intermediary between a portable computer system and an email server . . . . " *Id*. at 23-25.  Thus, for the patentee, the presence of a portable computer system, personal computer system and/or an email server is critical to the invention.  While not dispositive, this lends support to the conclusion that "second computer" is not a generic description of *any* computer system, but should be limited to either a personal computer system, email server, or portable computer.

Just as the '609 specification and its parent's prosecution history describe the invention in terms of the a personal or desktop computer, the claim language of the '609 patent suggests that the "second computer" is a "personal computer."  Similar to the patentee's description of the invention in the prosecution history of the '112 patent, Claim 1 of the '609 patent requires that a portable computer system, an email server, and a "second computer" be present:

> A computer implemented method of synchronizing email on two computer systems, said method comprising the steps of:
> > reading a first set of email messages from a portable computer;
> > reading a second set of email messages from an email server;
> > comparing, ***on a second computer***, said second set of email messages to said
> first set of email messages . . .

'609 Patent at 6:31-41 (Claim 1).  Thus, the "second computer" cannot be a "portable computer" or an "email server."  It follows from the specification's consistent description of synchronization as occurring between a portable computer and a desktop personal computer and from the prosecution history of the '112 patent's identification of three computer systems (portable computer, personal desktop computer, and email server), that "second computer" must be a "personal computer."

### b. "signal"[7]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|

---

[7] The term "signal" is found in claim 6 of the '609 Patent.

| "request" | "request from the portable computer that is separate and distinct from the data to be sent and messages to be synchronized" |
|---|---|

As an initial matter, both parties agree that a "signal" is a "request," however, the parties dispute whether the signal must be separate and distinct from the data to be synchronized. *See* RESPONSE at 29; REPLY at 10. Because "signal" does not appear in the specification, the only guidance provided in the '609 patent is the claim language itself. Defendants argue that the claim language requires the "signal" to be distinct from the data to be synchronized:

> in response to the *first signal*, synchronizing a first set of messages . . .
> receiving on the second computer, a *second signal* from the portable computer to send data from the portable computer through the second computer to an intended recipient;
> in response to the *second signal*, receiving the data from the portable computer.

'609 Patent at 7:11-19 (emphasized as in RESPONSE at 30). Thus, Defendants argue that the claim language requires that "signals [are] distinct events that trigger the synchronization, sending, or receiving of messages and data." RESPONSE at 30. Plaintiffs counter that Defendants' proposed construction unnecessarily confuses the jury. REPLY at 10.

The Court finds that neither the specification nor the claims require that the "signal" and the data to be synchronized are mutually exclusive. For example, neither the specification nor the claims exclude the possibility that the leading edge of the first set of data or transmitted e-mail could serve as a "signal." Similarly, the occurrence of the first set of data or e-mail could serve as a "signal." Without any indication in the specification that a signal does not encompass these possibilities, the Court will not import unnecessary limitations into the claims. As a result, the Court

construes "signal" as "request."[8]

### c. "in response to"[9]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | "as a result of and subsequent to" |

Defendants argue that "in response to" should be construed as "as a result of and subsequent to" because doing so confirms that the signal and the messages to be synchronize are mutually exclusive. *See* RESPONSE at 30. Moreover, Defendants argue that "Claim 6 identifies the first signal as the trigger for synchronizing a first set of messages and the second signal as the trigger for receiving the data from the portable computer." *Id.* Plaintiff argues that nothing in the '609 patent limits "in response to" according to Defendants' proposal.

The Court finds that neither the specification nor the claims require construing "in response to" as "as a result of and subsequent to." First, while Defendants' are correct that Claim 6 identifies the first signal as a trigger to synchronize the first set of messages, it does not follow that "in response to" must mean "as a result of and subsequent to." For example, Claim 6 recites ". . . in response to the second signal, receiving the data from the portable computer . . . ." Defendants would require the step of "receiving data from the portable computer" to occur as a result of and subsequent to the occurrence of a second signal. However, the claim language does not preclude the possibility that the leading edge of the "signal" triggers the response of receiving data from the

---

[8]Defendants also propose that the larger phrase, "a second signal from the portable computer to send data from the portable computer through the second computer to an intended recipient" be construed as "a request from the portable computer to send the data to an indented recipient, other than the messages to be synchronized and the data to be sent, through the second computer." *See* RESPONSE at 29 n. 17. The Court rejects Defendants' proposal for the same reason it construes "signal" as "request."

[9] The term "in response to" is found in claim 6 of the '609 Patent.

portable computer. Thus, the claim language does not preclude the possibility of the signal and response from over-lapping in time.

Similarly, the specification does not support Defendants' proposal. The specification uses the phrase "in response to" in the following context:

> The MAPI software layer 253 transmit a request packet across the computer network 270 to the MAPI compliant email server 280. In response to the properly formatted MAPI requests, the MAPI-compliant [sic] email server 280 sends information back to the MAPI software lawyer 253.

'609 Patent at 4:45-50. Nothing in this passage suggests that "in response to" must be construed as "as a result of and subsequent to." Thus, the Court rejects Defendants' proposal and finds that no construction is necessary.

### c. "synchronizing"[10]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Or, if construed, "ensuring that the email state on a portable computer matches the email state on another computer" | "comparing two sets of messages and reconciling the differences" |

Plaintiff argues that no construction is necessary because as "synchronizing" is readily understandable by a lay jury. REPLY at 16-17. Defendants argue that the specification continuously describes synchronizing as "comparing two sets of messages and reconciling their differences." RESPONSE at 27. Defendants also point to the prosecution history of the '112 patent, the '609 patent's parent, where "the patentees specifically described how the synchronization process is to be performed." *Id.* As an initial matter, the Court finds that "synchronizing" must be construed for

---

[10] The term "synchronizing" is found in claims 6,7, and 11-13 of the '609 Patent.

the same reasons that "synchronize" in the '215 patent must be construed, i.e., a lay jury's understanding of "synchronization" is likely different than that of a person having ordinary skill in the art at the time of the invention. Unlike the '215 patent disclosure, however, the '609 specification does not explicitly define "synchronization." For the reasons set forth below, the Court construes "synchronizing" as "comparing and reconciling the differences between."

First, the '609 patent disclosure supports construing synchronizing as "reconciling." For example, Figure 1*b* describes "software components that perform the synchronization of the two computer systems." '609 Patent at 3:3-5. In describing the synchronization process illustrated by Figure 1*b*, the specification explains "the records from database 163 that are associated with application program A and application program B are copied into the personal computer and then ***reconciled*** with databases A and database [sic] B by conduit A and conduit B respectively." *Id.* at 3:28-30 (emphasis added). Plaintiff argues that "synchronizing" may encompass reconciliation but is not limited to that function. REPLY at 6. Although "reconciling" may not be completely synonymous with "synchronizing," such a construction is necessary to prevent a lay jury from engrafting a modern interpretation of "synchronizing" onto the patentee's use of the term in 1997, the time of the invention. Plaintiff points to nothing in the '609 patent disclosure that is inconsistent with construing "synchronizing" as including "reconciling."

Second, the '609 specification consistently describes "synchronization" as requiring a "comparing" step. For example, Figure 3, which the specification describes as illustrating "how the email conduit 233 on the personal computer synchronizes the email state on the portable computer system 210 and the personal computer system 250," explicitly includes a comparing step. *See id.* at Fig. 3; *id.* at 5:7-10; *id.* at 5:37-42 ([I]f this is not the same personal computer that was used in

the previous synchronization then the conduit proceeds to step 337 where it **compares** the email from the portable computer system with the email from the last synchronization to determine the new, changed, and deleted email from the portable computer system)(emphasis added); *id.* at 5:49-52 ("Next, at step 340, the email from the email server 281 is **compared** with the email retried from portable to determine the new, changed and deleted email from the email server 281")(emphasis added).

During the prosecution of the '609 patent's parent application, the patentees specifically described the synchronization process as requiring a "comparing" step:

> To perform the synchronization operation, the email synchronization conduit reads the mail that is currently within the portable computer system and the email that is currently stored on an email server. The synchronization conduit then **compares** the two sets of email messages to determine the new and deleted messages. The synchronization conduit then writes back an updated set of email messages down to the portable computer system.

'112 HISTORY at 24 (emphasis added). This understanding is reflected in Claim 1 of the '609 patent, which recites a "method of synchronizing email on two computer systems" and includes a comparing step. *See* '609 Patent at 6:32-40 (Claim 1). While not dispositive, the patentee's description of the Claim 1 as a synchronization method that includes "comparing" lends support to the Courts' construction. Indeed, Plaintiff conceded at the *Markman* hearing that step 337, which requires "comparing," is part of the synchronization process. *See, e.g.,* PLTFF'S MARKMAN SLIDES at 76 (showing that steps 320, 330, 335, 337, 340, and 350 of Fig. 3 are part of the synchronization process).

### d. "concurrently" and "wherein the step of . . . is performed concurrently with the step of . . ."[11]

---

[11] These terms are found in claims 6 of '609 Patent.

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "concurrently" | "overlapping in duration" | Construed in the context of the larger phrase [below] |
| "wherein the step of . . . is performed concurrently with the step of . . ." | No construction needed | "wherein [the two steps] are programmed to be performed at the same time" |

The parties dispute whether "concurrently" should be construed as meaning "overlapping in duration" or "at the same time." Claim 6 requires the step of receiving data and the step of receiving a first set of messages are to be performed "concurrently." *See* '609 Patent at 7:21-26 (Claim 6). Plaintiff argues that "concurrently" cannot mean "at the same time" because, according to Plaintiff, "[t]he preferred embodiment of the '609 patent describes . . . a single, concurrent, two-step process in which new outgoing messages first are sent, ***and then*** existing email messages are synchronized." REPLY at 9 (citing '609 patent at 5:7 - 6:11 & Fig. 3)(emphasis added); *see also* MARKMAN TRANSCRIPT at 103:2-13. Thus, for Plaintiff, the two steps need not be completed at the same time but can occur one after the other.

In contrast, Defendants argue that the plain meaning of the term "concurrently" is "at the same time." *See* RESPONSE at 28-29. Moreover, Defendants cite several district court opinions construing "concurrently" as "at the same time" or some variant thereof. *Id; see, e.g.*, *Epicrealm, Licensing, LLC v. Autoflex Leasing, Inc.*, 2006 WL 3099603, at *11 (E.D. Tex. Oct. 30, 2006) (construing phrase with "concurrently" to mean "at the same time"); *Hewlett-Packard Dev. Co., v. Gateway, Inc.*, No. 3:04-cv-613, slip op. at 9 (S.D. Cal. Jan. 26, 2005) (Ex. J) (construing "concurrently" as "at least partially at the same time"); *Girafa.com, Inc. v. IAC Search & Media, Inc.*, 2009 WL 2949526, at *1 (D. Del. Sept. 15, 2009) *amended*, 2009 WL 3074712 (D. Del. Sept.

25, 2009) (construing "at least partially concurrently" as "to some extent, occurring at the same time"); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1314-15 (Fed. Cir. 2009) (construing "concurrently displaying" as "displaying at the same time . . ."); *Broadcom Corp. v. SiRF Tech., Inc.*, No. 8:08-cv-546, slip. op. at 28 (C.D. Cal. Sept. 3, 2010) (Ex. K) (construing "concurrently transferring blocks . . ." as "transferring at the same time . . ."). Lastly, Defendants cite to the prosecution history where the patentees added the "concurrently" limitation in order to gain allowance of the asserted claims over the prior art references. *See id.* at 29 (citing Ex. L to RESPONSE, SELECTED '609 PROSECUTION HISTORY (Doc. No. 315-13) ("'609 HISTORY")).

First, the prosecution history makes clear that "concurrently" cannot simply mean "in sequence" and/or "during the same process" as suggested by Plaintiff. During the prosecution of the '609 Patent, the examiner rejected the entirety of what is now Claim 6 as anticipated by U.S. Patent No. 5,857,201 ("the '201 patent" or "the Wright reference"). *See* '609 HISTORY at 4. The examiner explained:

> Regarding Claim [6], Wright discloses a method for exchanging data between a portable computer and a second computer, the method comprising: receiving, on the second computer, a first signal from the portable computer to exchange data with the portable computer; in response to the first signal, synchronizing a first set of messages on the portable computer with a second set of messages on the second computer; receiving, on the second computer, a second signal from the portable computer to send data from the portable computer through the second computer to an intended recipient; in response to the second signal, receiving the data from the portable computer; and sending the data to the intended recipient.

*Id.* at 4-5 (citations omitted). In response, the patentee added the concurrently limitation in dispute. *See id.* at 12 (adding the limitation "wherein the step of receiving the data from the portable computer is performed concurrently with the step of synchronizing a first set of messages on the portable computer with a second set of messages on the second computer"). Thus, Claim 6 was

allowed only after the "concurrently" limitation was added. As a result, "concurrently" must mean more than merely occurring in sequence, one after the other, as argued by Plaintiff. *See Spectrum Int'l*, 164 F.3d at 1378-79 ("by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover").

However, neither the specification nor the claims require that "concurrently" be interpreted as occurring at precisely the same time, as argued by Defendants. At the *Markman* hearing, Plaintiff characterized the preferred embodiment shown in Fig. 3 as two steps that are performed during the same process. *See* MARKMAN TRANSCRIPT at 87:5 -89:25. For Plaintiff, the "receiving data" step of Claim 6 includes Steps 310, 315, and 317 while the "synchronizing" step of Claim 6 includes Steps 320, 330, 335, 337, 340, and 350. As such, the "concurrently" limitation added during prosecution requires the first grouping (Steps 310, 315, and 317) to occur "concurrently" with the second grouping (Steps 320, 330, 335, 337, 340, and 350). Defendants' proposed construction requires the time-duration of the first grouping and of the second grouping to be co-extensive. Nothing in the prosecution history suggests such a limitation.

The prosecution history makes clear that "concurrently" cannot simply mean in sequence during the same process as argued by Plaintiff. However, as explained above, neither the specification nor the prosecution history requires that concurrently be construed as "at the same time." Moreover, as noted by Defendants in their briefing and at the *Markman* hearing, construing "concurrently" as "at least partially at the same time" is in accordance with the ordinary meaning of "concurrently" and is supported by case law. *See Hewlett-Packard Dev. Co.,* slip op. at 9 (construing "concurrently" as "at least partially at the same time"); RESPONSE at 28 (citing *Hewlett-Packard Dev. Co.* in agreement); MARKMAN TRANSCRIPT at 106:7-10 ("if it truly is a definition that

occurs partially at the same time, then that would likely satisfy the concurrent definition"). For the sake of clarity, the Court declines to construe "concurrently" individually but construes "wherein the step of . . . is performed concurrently with the step of . . ." as "wherein [the two steps] are performed at least partially at the same time."

## CONCLUSION

For the foregoing reasons, the Court adopts the constructions set forth above.

**So ORDERED and SIGNED this 17th day of January, 2012.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE